I'd like to begin with the argument made by Mr. Jones' prior counsel that his Pennsylvania convictions are not controlled substance offenses under the guidelines. As the government correctly pointed out in their supplemental authorities letter, that argument is now foreclosed by Sunkar. And so the most we can do is just preserve that for further review. So that's no longer at issue. Thank you, counsel. You're welcome. Does that, just to clear the, do a little more table setting, does that also render kind of beside the point or move the challenges, forget which ones right now, but I think the two enhancements, because they can, based on the law, you can get to 29 based on that. I think the base offense level was capped at 29. And so there are, of all the issues that his prior counsel put in the opening brief, the two enhancements were the two I thought warranted some further discussion. And I did, I am prepared to discuss those today. I don't, even if mathematically it didn't change the base offense level, I still think that it is relevant to whether or not the district court, you know, correctly, procedurally calculated the guideline language correctly and whether the sentence was procedurally reasonable. Because even if it didn't have the effect of raising the base offense level, if that were true, the district court still knows when it's going through and doing these calculations that these are things that would have bumped him up. It has that in its mind. And it's still, you know, enhancing, it's applying these and it's coming to a decision with all of these things in mind that it thinks are supposed to apply, even if it doesn't actually increase the base offense level. And so I do think it's absolutely relevant. And I do think two of them were wrong and incorrect. And I would welcome the opportunity to explain that to the court this morning. So I do want to talk about the four-level enhancement for the altered serial number as well as the four-level enhancement for trafficking guns. And beginning with the trafficking argument, Mr. Jones doesn't meet any of the recipient prong criteria for four reasons. He doesn't meet it first because there's no evidence in this record that I could find that he transferred two or more firearms to any one individual. And I think that's true. The district court could only rely on this single transaction that they discussed at the end of September. Are you referring to the two or more and to an individual as the commentary? Yes, the note, then note 13, yes. Why do we get there? Why is trafficking firearms ambiguous? It's the 2K2.1b5 says if the defendant engaged in the trafficking of firearms increased by four levels. And the commentary goes on to explain what they mean by trafficking and when that enhancement is supposed to apply. I didn't ask a good question. Do we look at the commentary if the guidelines themselves are unambiguous? Can we just look at the plain meaning of those words without the commentary unless they're ambiguous? That is, I believe, correct. However, I don't think that trafficking itself without the definition is, I don't think that that's ambiguous. The way the commentary would read was that if someone illegally acquired and sold 20,000 firearms to 20,000 people, they're not engaged in the trafficking of firearms, right? The way that it read is that it's meant to apply to what are called bulk transfers. So yes, that would be a correct example. Two to one would also be a correct example. The way the interpretive tools work, if we think that's an unreasonable interpretation of trafficking firearms, we wouldn't look to it, right? That's true, although I would also say that nowhere in these briefs did either of the then-counsels get into deference or anything like that. And I think that if the court is looking hard at deference principles, I think that I would request supplemental briefing opportunity for that because none of that is in these briefs. What about the evidence in the record that he sold 16,000 dollars worth of firearms to a few individuals in a hotel room? That is all that the government and the district court relied on, and I submit that that instance is actually not enough. That is insufficient to find that he or they transferred multiple guns to one person. And I'll point the court to JA, let's see, 379, where Mr. Woodard testified, quote, we met some guys there and gave them the guns. And so these are multiple buyers, and I don't think that's enough for anyone to conclude that Mr. Jones gave two guns to one person. Sixteen thousand dollars? What? I'm sorry? Sixteen thousand dollars worth? My point is that there are multiple sellers and multiple buyers, and I don't think there's any way to connect whether multiples went to any one person from Mr. Jones, or indeed from any of them. It could have been one-to-ones. It doesn't really say. This evidence just isn't sufficient to draw that conclusion as a factual matter. That was, again, what the district court, all it could rely on, too. That's at JA 1230. And so under both Henry and Daniels, that just falls short because, for example, in Daniels there was district court testimony in the record that Daniels, there was a transfer of two firearms to one individual person. They actually had that clear testimony, and it was still vacated or amended for the district court to reconsider under the correct definition whether or not it should apply. And that's far more than what we have here. What we have here is factually ambiguous. It just says that there were multiple sellers, multiple buyers, several guns changed hands, 16,000 worth. I believe that might, I don't know what the going rate is, but there's admittedly several guns involved in that transaction. But we simply do not have enough information. That's the problem with that instance at the end of September. And the point of that trafficking, the reason why that that is best read that way is to give independent meaning to the enhancement. Because as the First Circuit correctly points out, the point is that if it were simply an enhancement for trafficking in multiple guns or for selling multiple guns, that's already accounted for in the original offense level. There would be no need to create a second provision that does exactly the same thing as the original. It would be like a double. Well, the point is not, double counting is permissible, but the point is that as a matter of statutory interpretation, it is best principles to give each provision its independent meaning and effect and to do that wouldn't be. And so the First Circuit I think is very correct in saying so. And those are persuasive and we think the court should adopt those here. And I would also note just another factual matter that at JA-661, agent, I believe that's Boznak, pointed out that each trace report that they have for those recovered weapons identifies who it's recovered from. And so presumably if there was any evidence that two guns were recovered from one person, it would have been presented in this case and it hasn't been. So we just wanted to add that with respect to the trafficking. I'm happy to answer further questions on that. Otherwise, I'd like to talk about the altered serial number. At the time of Mr. Jones' sentencing, Harris required the district court to apply a four-level sentencing enhancement for the serial number that was altered but very much still legible and able to be read after his sentencing. But before briefing in this appeal, the Sentencing Commission promulgated Amendment 828 in which it made clear that Harris was incorrect. And it should have been clear in 2013 when Harris was decided. And the reason that the Sentencing Commission came out that way is because it pointed back to statements that it made in 2006, many years before, where it said, in 2006, we talked about the difficulty of tracing firearms. And that was kind of the basis for what's going on here is we want to have an enhancement for defendants who make it hard to trace firearms or make it difficult or impossible for us to trace these firearms. And so to state the obvious, there is no difficulty in tracing a firearm whose serial number is very much still readable, even if it's been scratched a little bit, even if it's slightly harder to read. But if it's visible to the naked eye, that is just not a concern. It's not in the spirit of what the Commission was trying to do. But the Commission concluded that that change would not be retroactive. Isn't that right? I actually don't believe they ever voted on that one. I did look at some of the voting that took place later in the year, and it seems like they voted on two other amendments. But at least to the extent that I could find from their meeting minutes, I don't believe there was a vote on it. However, it wasn't made retroactive. But we also think that's beside the point, because the lack of retroactivity is not what's requiring this enhancement to be applied to Mr. Jones. Harris is what's requiring it. If Harris didn't exist, this Court would be free to interpret the guideline for him any way it wanted to or felt appropriate. And I'd also add that whether or not an amendment is listed in 1B1.10 for retroactive sentence reduction 3582 motions is also kind of beside the point here, because Mr. Jones is here on direct appeal. He's never filed a sentence reduction motion. And so what we're talking about is in order for an amendment to be applied in this specific posture while the sentence is still on review and is not yet final. So that's a little bit distinct from retroactivity in 1B1.10. So I do think that the supplemental authorities letter that we filed recently brought Whitley to the Court's attention, which was a case in which it was the same kind of a posture. Somebody was here on direct appeal and was asked at oral argument, doesn't this amendment undermine this case that is precedential? And it wasn't considered in that case because it hadn't been raised in the brief. But here it was on page 39 of the opening brief. Amendment 828 was explicitly brought up and was raised for the Court's attention. So I know that the prior panel rule is usually pretty ironclad, but I think you have a situation here where the legal framework has changed. And so I think that you may be able to revisit Harris. And of course, if the panel concludes that it can't, then certainly the en banc court could. But that is what I wanted to add that was not in the brief. And Counsel, kind of back to the first point you acknowledged with the Sunkar case. It sounds like your argument is that even if we agree with you on these two points, it's not harmless because the district court had the potential applicability of these enhancements in its head and it was somehow part of the sentencing process? Yeah. I don't think you can expect the district court to just forget that there's an extra eight points out there that aren't in this calculus when it's imposing a sentence. And of course, I mean, there is one other thing, one or two other things that I would take issue with. I mean, at one point, the district court, in terms of justifying its sentence, did say that Mr. Jones had recruited some individuals who he didn't think would have broken the law but for his recruitment. But in the same breath, the district court also acknowledged that those folks were addicts and they were, my point is, by definition already violating 841 and 846 and probably several other things. And so I don't disagree that maybe perhaps they wouldn't have been involved in the drug trafficking or the gun trafficking conspiracy. But to say that these were law-abiding, upstanding citizens was factually not correct. The second thing is that I looked in the record for anywhere where the district court said, you know, and if I've calculated the guidelines incorrectly, this is still the sentence I would impose under the 3553. I didn't find anything like that. And I didn't find, I didn't find anything of that nature. I didn't find any realization that perhaps these enhancements really shouldn't apply. I mean, the district court seemed convinced that they did. It just, in his mind, didn't affect the math for the base offense level. So that is the most I can really say about that. But I'm happy to answer further questions if the court has them. Otherwise, I will reserve the remainder of my time for rebuttal. It's really clear. Do you concede that Harris would foreclose your argument? I know you talked about, of course, the panel, and that's more than just a tradition. That's actually what I'm guided by. Do you concede that it foreclosed your argument on that? It would. It would be binding on this panel unless you viewed the amendment as something that undermined it sufficiently that you could reconsider it, yes. Thank you. Ms. Shamblin? Good morning, your honors, and may it please the court. Leslie Shamblin on behalf of the United States in this case. I'll start with addressing the issues that Mr. Jones' counsel just mentioned, and I'll start out by saying that the district court correctly calculated Mr. Jones' guidelines in this case. Turning first to the issue about the application of the obliterated serial number, the district court in this case correctly applied the law at the time that Mr. Jones was sentenced. At the time, Harris was controlling. The guideline had not been amended yet, and as Judge Berner pointed out, it's not one of the retroactive amendments that is listed in 1B1.10. So even if it's something that if the case were remanded for another reason could be fixed because of the posture of this case being direct appeal, it's not something that is a legal error that the district court could fix. The district court, again, correctly applied the law that was applicable at the time that Mr. Jones was sentenced. Harris says that less legible serial numbers qualify under that guideline, and even if the amendment has changed that, again, the amendment was not effective. It's not retroactive. So even if it's something that the district court could fix, if this case were remanded for some other reason, it's not a legal error that this court should correct on its own. And turning to the gun trafficking enhancement, I would remind this court that that's a... Just to stay on the serial numbers for a moment, do you agree that if Mr. Jones was sentenced today, it would not be proper to apply that enhancement? That's correct. Under the facts of this case, I believe that there were some serial numbers that were just readable because they were able to trace them, but not necessarily like it would have been coming from the factory on a brand new gun. And your opposing counsel submitted a 20HA letter that said that we should consider these intervening changes in the sentencing guidelines in this case because it's a direct appeal. You didn't respond to that letter. I'm curious what your response is to that argument. So Your Honor, just talking about how this court addresses those, I think this circuit's precedent is pretty clear that it only fixes them if it's some kind of like clarifying change to the amendment. But this one, Your Honor... What case are you relying on for that proposition? That comes from United States v. Goins, which is 357F3469. It's a case from 2004 that was substantive changes that aren't retroactive. That's not something that this court is going to fix on appeal. And it also makes pretty clear that a change is substantive if it conflicts with prior precedent. A change in the guidelines is substantive if it conflicts with prior precedent. And of course, I think I can safely concede that the amendment 828 to the guidelines does conflict with Harris in what it says about whether less legible serial numbers qualify for this obliterated serial number enhancement. If Harris would no longer be binding, if the individual were sentenced today... That's correct. What you're saying is that we can't consider this intervening change even on direct appeal? Correct. Or we can't apply the intervening change on direct appeal? Correct, because it's a substantive change that's not retroactive. If there are no further questions about that, I'll turn to the gun trafficking enhancement. And to the point that I believe you raised earlier, Judge Quattlebaum, if the gun trafficking enhancement is going to apply in any case, why not this one? I mean, this is a very clear example of gun trafficking in its most harmful way. And there's plenty of evidence in this case that the defendant was trafficking guns from West Virginia to Philadelphia. You know, they'd get them in Beckley, they'd take them up to Philadelphia. The district court, in finding the enhancement, focused on a particular set of transfers. As Ms. Stoma mentioned, it was the transfers that happened at the end of September of 2020 is what the district court principally relied on. And the testimony was that they took some guns, they had come to Philadelphia, the guns were purchased by Bickford and perhaps others on September 26th or 28th, and then shortly after that, around the 28th, they went to a hotel room in Philadelphia, sold them in bulk for $16,000. Abdulla testified that they sold eight guns. I think that Woodard may have testified that there were about ten. So the actual number wasn't clear. But to a point that was made earlier, while Ms. Stoma was up here, it's reasonable to assume since they say, you know, the testimony is, we're buying these for $400, we're selling them for $1,500. The math just works out to where there's a $16,000 sale that there is multiple guns associated. And again, the testimony that there were eight guns, there were ten guns, supports that. And I think it wasn't clear error for the district court to think that that transaction involved the sale of multiple guns to a particular buyer. Because you have a group like the defendant and his co-conspirators who are agreeing to do this. There are about four of them. You have them and like the defendant is kind of their guy. He's supplying all the money for them to be able to do this. They're getting a cut of the profit. And going up to Philadelphia, I mean, it's reasonable to assume that they're all meeting together in this hotel room and the people they're selling them to are sort of involved in the same way. It's not that far-fetched. And again, the standard of review is clear error on this. It's not that far-fetched to think that that particular transaction and the way that it was set up involved the sale of multiple guns to a single person. So you have him receiving multiple guns in Beckley when he gets them. And then you have him transferring multiple guns up there when they're transacting them. And we don't have the precise number of buyers in the hotel room. What do we have about that? I mean, I hear your point that we don't have to have precision on clear error. But what do we have about the buyers? Your Honor, I don't believe that there is particular testimony. You're correct about how many there were. But the testimony does reflect that there were multiple people that they met. Was it, am I remembering right, like a handful or a group? I mean, was there some description besides just plural? Your Honor, I don't recall right off the top of my head. But I believe that's correct. That it was a testimony that it was multiple people. That there were multiple people in this group that they were selling to. But there were no specifics about, you know, this one guy took the money or whatever. That did not come out at trial. That's correct. And I think this Court should not flat out adopt the Henry and Daniels approach to this because it does away with people like Judge Quattlebaum mentioned who are buying an extreme number of guns. He used the number of 20,000. It eliminates those people just because they might happen to sell to 20,000 different people. But again, going back to the plain meaning of gun trafficking, that is gun trafficking. And it might not come up now because the language of this has changed and gone to the, as the guidelines currently stand, the firearm trafficking enhancement is not described necessarily in the application notes. It's actually in the body of the guideline. So it may be a moot point anyway. But it's, I mean, I personally just think that it's silly in light of the rules that deal with multiple sales of firearms and how those are recorded. I mean, you can buy, it's within... One reason, I mean, I'll point out the example that might suggest some silliness. But the response might be, look, that's a, you're going to get convicted on that. You're just, that's drug trafficking in the sense of an offense. But if you're going to have an enhancement for the thing you were convicted of, it might, should be something different from that. Your Honor, I believe that that is correct in the sense that everybody's conduct, so this guideline is meant to apply to all types of gun charges, as Your Honor is aware. So you've got, you know, felons in possession who, they're convicted of that, but they maybe weren't trafficking them, so they won't apply. So it's meant when the facts are egregious like they are in this case, to increase that liability because of the specific factors around the defendant's conduct. I mean, the evidence that came out at trial is that he's got no regard for what he's doing. It's a profit... It sounds like you're saying he's a bad guy, we should do it. Your Honor, I'm not saying that. But I am saying, kind of going back to my original point about this enhancement, is if it doesn't apply in this case, what case does it apply in? Because this is gun trafficking by anyone's definition. What this group of people was doing is gun trafficking as normal people would understand the word. And to apply the guideline in a way that takes away from that, and would not apply it in this case, is, essentially, makes the guideline meaningless. And so that's the point that I'm trying to make. If there are no other questions about that particular guideline, I would like to address before I sit down the sufficiency of the evidence on count two, which is the money laundering count. And the reason why I'd like to talk about that is because the defendant's brief focuses a lot, I think, on what I would qualify as the incorrect conspiracy. So really there are two conspiracies here as we're charged in the indictment. There's the conspiracy to deal guns without a license, and that one involves the straw purchasers and all of that. But then there's also this conspiracy to launder money. And that's more about these four guys from Philadelphia who are the ones that are making, they're the ones that are making the most money off of this. So, again, this was charged as promotion, a conspiracy to launder money in promotion money laundering. And the substantive money laundering is proven by the evidence about how these transactions were working and the structure of this gun traffic and conspiracy. So the defendant is financing the straw purchases through cash shop, wire transfer, drugs, just plain cash, letting them keep leftovers. And he needs the straw purchasers because they're the ones who are giving him the ability to turn these guns around and go up there and sell them for a profit. He can't do that himself because he can't buy the guns. He can't get the guns legally from stores. So that's where the straw purchasers come in, but they are not themselves involved in the money laundering conspiracy. And Have you gotten to the money laundering yet? Because you've gotten to the straw purchases, but tell me about the money laundering. Because it literally means to clean up money that has a nefarious or criminal origin, right? Or their structure to basically say, well, you did this by hiding it by making smaller and smaller. Tell me what the money laundering aspect is. So I would distinguish, Your Honor, respectfully between concealment money I'm not disagreeing with that. I'm just asking you to make it clear. Just make it clear to me what, because you said, well, they're just cash apps and these people. Isn't it just like you do anything else with a bunch of criminals? I mean, allegedly. Well, no, they've been convicted, but the person says, okay, here's $500. Go buy a gun. And they buy it. Is that money laundering? So, Your Honor, I No, let's take it by a little bite size rather than this big gulp. Is that money laundering? Did you say, here's $500? Illegal, obviously. Here's $500. I want you to make a straw purchase of a 9mm. And then that person then sells that gun or gives it to someone else. Where's the money laundering? Heaps would make clear that the mere paying a straw purchaser to purchase a gun is not necessarily money laundering in and of itself. It's not at all. Not necessarily. It's not. So that's why I'm trying to make the point that this is a separate conspiracy that the testimony from Woodard and Abdullah in particular that this was a profit-driven venture that they were doing. You have the text messages that were Profit? That doesn't make it money laundering either. Okay. I'm getting money from it. Tell me the money laundering part. So the defendant in this case is supplying all of the money for this venture. Well, I understood. But there was testimony from Abdullah and Woodard that he'd never had a job. There was the lack of records from the IRS saying that he had never filed tax returns from 2018 to 2021 during the time that this conspiracy was ongoing between September 2020 and July of 2021. And there was also information that we introduced in the form of summary records and bank records that he made about $65,000 in deposits into his bank during, between July of 2021. So under... That may, as I read the law, be evidence that he did this type of, I forget, you were, there's two types of money laundering. This type, maybe that's that he did. But your claim isn't money laundering, is it? Isn't the claim conspiracy? That's correct. So if that does suffice for the defendant, what's the evidence that he agreed with others to money laundering? So that's where I think the text messages come through. So... Tell me what they say. With regard to the particular transaction in September 2020 that I talked about earlier with respect to the gun trafficking enhancement, we introduced text messages between Woodard and Mr. Jones that Woodard is angry because out of that $16,000 transaction that they made, Woodard was supposed to get $3,000 of that and he got none. And, you know, the case law is pretty clear. They don't have to have an agreement that says, hey man, you want to launder money with me. So the fact that he was supposed to get a cut of that and that he knows that Mr. Jones is financing this and we introduced photographs of them whenever they're down in Beckley. They're taking photographs at Sheetz. They've got a big wad of cash that they're all passing around. And again, the fact that Woodard and Abdullah testified that this was a profit-driven scheme, that the reason why they were doing this is to make money, it's pretty obvious that Mr. Jones, who is the supplier of that money, is getting his money unlawfully. How is that obvious that he's getting it unlawfully? Because he doesn't have a job. He's yet, he's depositing all this money. He has a rich uncle, for example. So you have to have a job to have money? No, Your Honor, I don't believe you do, but it was. I don't think so. You don't have to have a job to have money. It was a reasonable inference for the jury to make that this was. So that's the thing, you take this to a jury, you know, it's like you throw it up on the wall, something's going to stick. What basis or framework of how they're instructed to take that? Well, you can assume that he must have, he didn't have a job, so he's a thief. He doesn't have a job because he's a money launderer. I mean, it's like the sense of overcharging it. Clearly, they were buying guns, working together to do that. But the money laundering part is very important because that's, you add that on. I mean, you made it in the United States government. You add that on to the charge that you conspired to money, to launder money. And you don't have to commit any other substantive crime for that. That's why it's so ubiquitous. You have to be very careful about that. I just want to know what part of it, you told me they wanted to make money, yeah? You told me that, well, one of them was supposed to get this cut, but he didn't get it. That doesn't make a lot of money. They're a crook on top of a crook. I was supposed to give you half of it, but I'm going to give you any of it. I'm going to give you a quarter of it. Where's the money laundering in that? All you've told me is that they were in cahoots to these straw purchases and sometime he didn't, he fell short in what their cut was. But that's not, is that money laundering? But then the other one is he said he can assume he must have gotten that money from another perp because he didn't have a job. That's the only thing you told the jury? That you can assume that because he didn't have a job, that made a conspiracy with them to launder money. Is that right? Two things that I would respond to that. First, Woodard was not a straw purchaser. He did recruit other straw purchasers, but he was the one who was supposed to get the $3,000 from that $16,000 transaction. He's one of these money laundering co-conspirators because the point is that Mr. Jones is the one financing all of this. He's throwing his money into it. He has no job. He has no other source of income. Aiding and abetting. They're partners in a crime. That doesn't make it a conspiracy to launder money. That's why I wanted to get to, that's different. What you told me is that he's a joint person, he's not a straw purchaser, but they're together and they're involved in this situation. Maybe it's a recall. I don't know what it is. But money laundering is something different, isn't it? In this case, the purpose of the money laundering and why I mentioned the substantive offense and how it's structured with the firearms trafficking is because that's what's alleged in the indictment. That the defendant wanted to promote money laundering, wanted to promote firearms trafficking, and that was the purpose of the money laundering. So when you come back to, Your Honor, I see I'm about to run out of time. May I finish answering your question?  Thank you. So the defendant's financing this. He has no legitimate source of income. Again, that was a reasonable inference for the jury to make given the evidence that was introduced. Yet he's consistently putting money in this over a course of roughly 10 months and they're making a profit on it that's just going back. They made another trip in October to go back and buy more guns. And I would submit, Your Honor, that given all that evidence for the incredibly favorable standard given the jury's verdict, that these were reasonable offenses that could be made from the evidence. And, Your Honors, if I may just wrap up, if there are no further questions, the United States would ask that you affirm the defendant's conviction and sentence. Thank you, Counsel. Thank you. Counsel went into an area you didn't touch on, so. Yeah, I have a point I'd like to make in response to that, which is that at JA 1272 PSR paragraph 94, the PSR states that Mr. Jones had worked under the table jobs clearing property and cleaning houses. And so there's no, we're not here to dispute that he has some money from unlawful activities, but I think that the idea that none of his money was from anything lawful is just simply, there's some support in the record that that's not true. That's not the standard. In terms of, I mean, to me there's a difference. It's important to think about money laundering and there's importance to think about conspiracy to launder money. I think Judge Gregory makes his questions illustrate an important part that just trafficking is not, and getting money for it, is not laundering. But using money to put it back into the scheme may not be the way we think of kind of mafia money laundering, but it is definitionally money laundering. Promotional, yes. And so that, and the evidence of money without a legitimate source, there's law that says that can be evidence. So there's one thing, maybe there's evidence that Jones money laundered, but the charge is conspiring to money launder. And I think that's the harder question is did he agree with someone to do all that. I mean, your colleague pointed to some of that. What's your position? I mean, you can talk, maybe I'm wrong on all that, so respond to whatever, but that's the one I'm particularly interested in. I would like to, I mean, I would point the court to, there's, I believe it was Mr. Woodard. One of his co-conspirators in the gun trafficking conspiracy testified that he needed, the reason, and my opposing counsel brought that up, that he was mad that he didn't get the proceeds from that sale, the $16,000 sale. And the reason he was mad about it, he testified, was because he needed that money to pay his bills. He couldn't pay his bills. He needed money to, he said, I don't have money to buy my son food. And so here's where the problem is, is that that's not an agreement to put money back into gun trafficking. That's, that's, I want my cut so I can take care of my business. And under Heaps, like, that's the sort of thing that is not promotional money laundering. It is paying your life expenses. And also the same, the Heaps cites a case called Jackson from, I believe, the Seventh Circuit, which said the same thing. It excluded from that money to pay bills and pay rent. So I'm not sure they've got any sort of evidence about an agreement with someone else to put this back into the guns. These people all want their cuts so they can take care of their own personal expenses. Does it, though, and I think that, I appreciate that argument, but if, is it fair to look at the fact that the same four individuals are going back and forth to West Virginia multiple times, coming back with guns, selling them, getting a profit, and continuing to do the same thing multiple times over and over, does that not allow the jury to infer that the money they are getting from the profit of sales are going back to the next time they purchased the guns? I think, again, the distinction matters. I think it's definitely a conspiracy to traffic guns, but I don't think there's any evidence that they are taking their cuts or this money and putting it back in. I think they all very selfishly want their own cut to, again, put it towards their own expenses. I don't think there's an agreement to use that money to put it back in. But they've got to buy the guns, you know, they've got to buy the guns some way or another when they go back down there. That money was all coming from Jones, though. It wasn't coming from anyone else. Yeah, I hear you. I do have a couple other points I'd like to very quickly make before I run out of time. My co-counsel brought up Goins, and I would just simply point out the distinction I made earlier is still relevant here because Goins was, I believe, a 3582C2 case, and so it's a different posture. This is, you know, this is a direct appeal, and so Goins is not exactly on point. I would also note that in terms of the money laundering conspiracy, that actually is important because vacator of that count would affect the sentence, unlike the guidelines issues. The district court ran those consecutive, and so it absolutely would affect the sentence. And regarding the harmlessness, I also want to add that the district court did give Mr. Jones, even though he stacked the sentences consecutively in order to reach a certain amount, he still did vary downward a little bit on the sentence overall from the guidelines. And so I think had the district court realized that it was incorrectly believing that four to eight points were, you know, properly warranted for Mr. Jones, I think it could and would have gone lower. I see I'm out of time, so unless there are further questions, I would ask the court to vacate and reverse. Thank you, Ms. Ottowa. I note that you were, even though you work as a federal defender, that you were assigned to this case, and I want to, on behalf of the court, thank you for that. We appreciate lawyers like you and others who help us in these cases, and thank you so much. And obviously, I note Ms. Shamblin's able representation in the United States. We'll come down and get counsel to proceed to our final case.
judges: Roger L. Gregory, A. Marvin Quattlebaum Jr., Nicole G. Berner